Good morning, your honors. Good morning, Judge Nelson. I promise no health care forms were filled out to bring or to defend this case. With me, my name is Roger Flynn, and counsel for plaintiffs, and with me is Jeffrey Parsons, my co-counsel. There's a lot of legal issues at stake in this case, the Federal Land Policy Management Act, FLPMA, the National Environmental Policy Act, NEPA, the 1872 Mining Law. But really what we think this case boils down to is the Administrative Procedure Act and the fundamental rules governing judicial review of agency decisions. And those decisions have to be based and supported by substantial evidence in the record, and they cannot be based on an incorrect analysis or interpretation of federal law. So what happened here, we think BLM, Bureau of Land Management, made two fundamental errors. The first one, it based its land exchange decision on its view that mining would occur, full-scale open-pit copper mining would occur on the selected lands, the lands that would be given to ASARCO, no matter what. Regardless of the exchange, mining was going to occur the way ASARCO wanted it. And as I read the papers here, they made the assumption that mining would occur no matter what and in the same manner. The exact same manner. If you look, and we cited a number of the statements in the record, particularly in our reply brief, that the foreseeable uses of all the land was copper mining, that there were no other alternatives. The chance of no open-pit copper mining on the selected lands was nil, nil. We just think that those were based on two fundamental misinterpretations of federal law and based on actually lack of any evidence in the record. Is it that simple, or as I understand it, there are three different types of mining activities, open-pit being the most extreme or the most expansive. Is your position that all, what is it, 7,000 or 10,000 acres, I forget which is which. The federal government is going to get 7,000 acres. So is your assumption that ASARCO is going to engage in open-pit mining on all 10,000 of the acres to be exchanged? Well, we don't know. That's one of the problems here. ASARCO has never submitted a final mine plan. Some of the lands would be used for waste dumping, which you have these big waste piles that are hundreds of feet high and they douse some of the other facilities with sulfuric acid. It can be pretty nasty. But I guess where I'm going with my question is that some of this land would require a fair amount of additional investigation by the miner or the prospector, whatever you want to call ASARCO, in order to determine whether or not there is even a sufficient amount of mineral present in the land to warrant full-scale mining operations. And am I right that before you can engage in full-scale mining, open-pit mining operations, you would have to go through an additional permitting process to comply with all kinds of mineral regulations? Right, exactly. The key federal law here that would not apply if the lands were exchanged. If the lands were exchanged, it would go into private land, not subject to any federal law. The key federal law here governing mining on the public lands is FLTMA, which says the federal government cannot approve a mine if it would cause undue degradation. Now, the BLM based the exchange on that mining would occur no matter what. The chance of no mining was nil, and it never went through the analysis to find out whether mining would comply with environmental laws or anything like that. Let me ask you this. You said that FLTMA is an important law that would not apply once this goes into private hands. My understanding is, in addition, that if the land were to stay in the hands of the government, and if the owner of mining rights, for example, ASARCO, wanted to engage in mining operations that would exceed five acres in the amount of land that would be disturbed, ASARCO or the owner of the mining rights would have to submit a plan, an MPO. A mining plan of operation. A mining plan of operation. And in order for BLM to determine whether to approve the MPO, the mining plan of operation, the BLM would have to prepare under NEPA an environmental impact statement. Is that correct? Eventually, they would have to. You said, eventually, they would have to prepare in the EIS before they could approve the MPO? Right, exactly. For example, the number of cases in the Ninth Circuit, the Great Basin Mine Watch case, we argued a few years ago where the Ninth Circuit struck down a number of EISs on a failure to do proper NEPA analysis. Yes, they would have to do it. So one of the consequences of this land swap, if it goes through now, is that the EIS that would have to be prepared for every parcel in excess of five acres before a mining plan of operation would be done, that EIS would be required if it stays in government hands. And if the land swap is permitted and this land now goes into private hands, to be simple, no EIS would ever have to be prepared. Well, that would be correct. The company and the BLM have argued that maybe the Corps of Engineers would conduct some sort of NEPA analysis for the small amount of discharges that may occur from dumped material in streams. We don't know if that would ever occur. That may occur. That would probably not be an EIS. Corps of Engineers usually does small environmental assessments. But certainly you would need an EIS on BLM land, and if it's not BLM land, the chances of an EIS being done are totally speculative. Probably not. So by making the assumption that mining is going to occur whether or not the land swap occurs and it's going to occur in exactly the same manner and degree whether or not the plan occurs, what are the consequences of allowing this to happen in private hands? We are never going to get an EIS, an environmental assessment, of the consequence of any of the mining that will take place on the swapped land. Whereas, in other words, if it stayed in private government hands, we would have to have an EIS every time they submitted an NPO. Right. The two main laws that are going to be either outright eliminated or substantially reduced to the point of elimination are Flipman. Arizona state law on mining really doesn't have one of these requirements that you have to prevent undue degradation. They don't have a thou shalt deny if the mine is too damaging. Arizona law doesn't have that. And Arizona has no EIS. Some states like California, Washington, Montana have these state NEPAs. Arizona does not. So we would lose the NEPA requirement. And that was one of the things, if you know from the briefing, that we had argued that one of the NEPA problems is that the BLM, for example, in the Ninth Circuit Muckleshoot case, which involved a land exchange up in Washington state, that BLM should look at the impacts from future development of the land after its exchange. But the difference between Muckleshoot and this land swap is the mining law of 1872. And to me, that's a difference that makes a distinction, or a distinction that makes a difference. The land that we're talking about, whether it's in federal ownership or not, is available for mining. And if ASARCO is able to, I don't know what the term is, work its claims to these lands, even if ownership remains with BLM and there is a merchantable quantity of copper on the land, then they're going to have to go through the same kind of environmental impact statement review whether they own the land or BLM owns the land. No, if it's private land, NEPA doesn't apply to private land. Obviously it applies on public lands, so BLM has a duty to do NEPA, as we know from all the cases. But don't they still have to file a mining plan of operation? No, they would have to, not to BLM. BLM is out of the picture. In fact, that was BLM's goal here, is to not have to regulate the ASARCO expansion of the Ray Mine. Now, we're going to get some good public land out of it, some new public land. We're not denying that, but we're really looking at what's going to go on down at the mine site. And that mine, as we pointed out on the record, has numerous Clean Water Act violations. This mine has problems if they want to expand. But once you take it out of public land, the mining law doesn't apply, FLPMA doesn't apply, NEPA probably won't apply in most situations. But, you know, you mentioned the 1872 mining law, and the council for the government of ASARCO will say we're making a mountain out of a molehill here, that this case doesn't involve the 1872 mining law. But if you look at all the citations in the record, and that's what we have to look at, they base the exchange on the assumption that ASARCO had rights to mine. And as we pointed out, and I think even the IBLA, the Interior Board of Land Appeals, agreed with us on this point, that in order to have a right to mine, more than just minor exploration, you file your mining claims, you get some rights to explore the claims. But in order to develop these huge open pit mines with these waste facilities covering thousands of acres, you need to have the valid mining claim. And that means you have to have discovered the valuable mineral deposit. There is absolutely nothing in the record that points to any evidence saying that there's a valuable mineral deposit here. The only evidence... Council, may I ask a question about that? President in our circuit seems to indicate that an unpatented mining claim is property in the full sense of the word. So why does ASARCO not have a right to mine this property? The filing of the mining... When you file your mining claims on federal land, you get certain property rights. You have the right to explore, which is a property right, and then you have the right to exclude other claimants. What you don't have a right to do is to have an absolute statutory right to full-scale mining development over the five acres that Judge Fudge was talking about. The Supreme Court, as we talked about, the Cole v. Ralph case, the Lara v. Interior case from the Ninth Circuit, even the I.B.L.A. decision specifically says that without a valid mining claim, you have no rights against the United States to get your mine absolutely approved as a statutory right. So there's really two levels of mining rights going on here. You file your mining claims, you get some rights, but you don't have a right to fully develop the claims without the evidence of the valuable mineral deposit. And here there's absolutely no evidence of the valuable mineral deposit. Again, under the APA, they're making an assumption that mining is going to occur no matter what based on rights under the mining law, but those rights, the full rights, don't accrue without the discovery of the valuable mineral deposit. And actually the only evidence in the record is the appraisal from the BLN that says those lands were only, they low-balled the appraisal at $150 an acre precisely because they lacked valuable minerals. So the evidence in the record here not only shows that there's probably no valuable minerals there, the evidence goes that there's no value at all really. And so you're right that there's some mining claims that have some property value, but not the right against the United States. We pointed that out from the various court cases. If an owner of mineral rights files an MPO, that is to say wants to engage in mining operations, is the BLM required to engage in a determination as to whether or not there's a valid claim? That's a very good question that's come up here in the briefing. You don't have to do a validity exam on every claim. But if you're going to assume someone has a right, and if the Supreme Court said that right hinges on the discovery of the valuable mineral deposit, then you should check to see if those claims are valid. This line of argument seems to me technically possible, but it seems to me practically not very likely because it seems to me simply improbable as a practical matter that a SARCO would be spending all this money to try to get fee simple to land at which there really are no valuable minerals. That doesn't make any sense to me. That's right. One of the probably what I think they'll probably, if they ever submitted a mine plan, they'd probably use this land for waste dumping, the thousands of acres for waste dumping, which is needed to get rid of the rock once you take it out of the big mine pit. Speaking of quantity, I noticed in the EPA objection, EPA does not seem very happy with this. No. The EPA says in its letter objecting to this plan going forward that one billion tons have been so far mined at this mine, and if the land swap goes forward, an additional three billion tons will be mined. So we're talking about a huge scope here. Where do those numbers come from? Are they accurate? Yeah, well, we don't know exactly what would occur there. The company first thought of expanding its rate complex back in the early mid-'90s, and here we are 15-plus years later, and they've yet to submit a plan, so we're not really sure. Sometimes that fluctuates on copper prices. Copper prices were really high just as a year ago. Everything else, as you know, has dropped. There's a lot of mining operations going on here in San Francisco of stealing wire. Yeah, they are stealing copper wires. Copper prices, as everything else, like the stock market, has dropped recently. But this mine, we don't know how much it would be, but a billion dollars. We just had another case on a gold mine. A billion tons of waste rock is typical for one of these big open-pit mines, and Ray is one of the bigger open-pit mines, copper mines, in the country. And I wanted to reserve some time for rebuttal, but I just wanted to hit on the NEPA issues a little bit here because, obviously, without a proper NEPA analysis, no decision can go forward as the Ninth Circuit has done. If I understand your argument, aren't you really saying that if the government gives up its title to this land, it has an obligation before it approves the transfer to add restrictions to the transfer so that all of these environmental assessments will be required no matter what? Well, the argument on the restrictions actually goes to the land the federal government, the public, is going to get. That was mostly our argument because the public lands that the BLM is going to get in the exchange are of pretty high value, at least looking at the record. Some of the lands we're going to give away have some high value, too. But what we're saying is when the BLM is going to get this new public land, we said, why didn't you restrict the filing of new mining claims on this land? Because we could be back to square one in a matter of months, in 91 days, that land could be opened up to mining claims again. And so BLM essentially wants it both ways. They're saying, well, we're getting all this great value, and land exchange is in the public interest because, heck, we're going to mine it anyway. They're going to mine it just the way they want anyway, so why don't we get some public land acreage? It sounds on the surface like a pretty good deal. We talked about the NEPA problems and all the other assumptions not based on the record. But the land the public is going to get in 91 days is going to be all open to mining claims. OSARCO, you and I could file mining claims on that land in 90 days. I mean, that's what Congress has provided, the rights of miners on public land. Right, you have a right, like I was saying to Judge Nelson, you have a right to file the claims. You get some limited rights once you file the claims. But without the claim validity, you don't have any rights against the United States. And even if, I think this is important, and I'll end on this point, even if you have valid claims, the government still has the authority under federal public land law, FLTMA, to deny mining that would cause undue degradation. Why shouldn't I assume that if OSARCO is willing to give up those lands, that it can't have much value from a copper mining standpoint? Well, you know, I can't speak for the company, but in my sense, working on all these issues all these years, the reason why OSARCO wants the exchange is because it gets rid of FLTMA, the potential to deny their mine, which is not going to happen on Arizona law, and they don't have to go through an EIS process with the BLM. And I think those are, again, they'll probably say that's not our reason, but in my experience, that's why big companies do these exchanges to get away from what can be, you know, a very onerous and lengthy federal public involvement. And we think that public involvement, the public has a right to that. And I have a few minutes left I'd like to save for rebuttal. Thank you very much. May it please the Court, I'm Mark Hague for the Department of Justice for the Federal Police. I'll be dividing my time with counsel from the intervener. I'd like to take 15 minutes and give Mr. James five minutes. This is an APA challenge to BLM's decision to approve a land exchange. And I want to stress at the outset that what we're talking about is a land exchange, not a decision to approve mining, not a decision on the validity of OSARCO's claims. Neither of those things has occurred, and neither is a prerequisite to BLM's decision to approve the land exchange. But we do have prerequisites compliance with FLIPMA and with NEPA. I missed the first part. We do have as prerequisite, I guess I'll stay focused for a moment, on compliance with NEPA. Yes. To say the EIS here must be adequate under NEPA. That's correct. And my problem with the EIS, as I think I've already signaled, is the assumption made by the BLM that no investigation of the actual environmental consequences of the mining that will take place is necessary, because mining will take place in the same manner and to the same degree, irrespective of whether the land swap is made. That's the position of BLM as I understand it. Well, the second part of that is correct, Your Honor, that BLM assumed for all of the alternatives and the no-action alternative that the use of the lands would be the same whether or not. And, therefore, they don't need to say, well, here are the environmental consequences of the mining because the environmental consequences are going to be the same. Therefore, since there's no differential, we don't need to analyze it. Well, there is a general discussion of the impacts of mining of these lands in the EIS, and it's under the heading of impacts common to all alternatives. So for all of the various categories that are analyzed, the EIS begins with the discussion that whether the exchange is approved or not, there is likely to be mining and it is likely to have these impacts, and that's set out throughout the EIS. My problem or a serious problem I have with what the BLM wants to do here is that an EIS with respect to a specific project, not with this land swap, but with respect to a specific project, whether it's cutting down trees, whether it's building a dam, whether it is, in this instance, authorizing mining operations pursuant to an MPO, is a fairly detailed analysis of water flow, leaching, the whole business, in much greater detail than we see here. And my understanding is that if this land were to stay in public hands, any time a SARCO, a holder of mineral rights, wants to engage in mining, it's got to go through an MPO process, and the BLM would be required to engage in a very detailed environmental analysis. And the land swap totally eliminates that obligation. We're never, never going to get that detailed environmental impact statement on any of the planned mining operations because they will now be in private hands. Well, there are a couple of points in response to that, Your Honor. First, the change from public ownership, from federal ownership to private ownership, does not change the application of the Clean Air Act, the Clean Water Act. I wasn't talking about Clean Air Act. I wasn't talking about Clean Water Act. You're talking about NEPA. NEPA. And the Corps of Engineers has already indicated that for the Section 404 permits that would be required for these, for future mining developments, it will require an environmental impact statement. To the extent... Which would take one piece out of that. Well, it would take the impacts to that resource. Yes. But it would be far less than a full EIS that would be prepared and pursuant to an MPO, correct? Well, yes and no, Your Honor. The state permitting requirements under the Aquifer Protection Act... I'm not talking about state permitting. I'm talking about MPO and I'm talking about EIS. The state has a public comment process, public notice and comment process, for its permits. So under the state process, you don't get a federal NEPA for a mining protection plan, but you get the state public comment process on the state permits. And the state public comment process, are you representing to me that it is stringent in the same manner as NEPA? My understanding is that Arizona does not have a state law equivalent of NEPA. That's right, it doesn't. But it has a public comment process on the permits. And there are so many points here, it's difficult to untangle them. But one of them is NEPA is not a substantive statute. I know that. NEPA is a procedural statute. I know that too. It doesn't change the environmental requirements that apply. The mining plan of operations that BLM would prepare if the lands were in federal ownership under 3809, 43 CFR 3809, has the standards for preventing unnecessary or undue degradation of the lands. And those standards are tied to, the substantive content of those standards is tied to compliance with the Clean Air Act, compliance with the Clean Water Act, compliance with state requirements. One of my problems with your continuing moving off of FLIPMA and moving off of NEPA and relying instead on Clean Water Act and on Clean Air Act is that it often happens that you can get before it happens if we're talking FLIPMA and if we're talking NEPA. It often happens if we're talking Clean Air Act and we're talking about Clean Water Act, is the damage is done and then you go back afterwards and you fine or you enter into a consent decree and so on. I'm not sure that, in fact, I'll say it a different way. The nature of the protection provided by those statutes overlaps to some degree, but in the end it's quite different. The procedures are different. I don't think that the substantive requirements are different. No, you can't possibly say that. The substantive requirements of the Clean Air Act are very different from the substantive requirements of NEPA. I'm sorry. What I'm saying is that the procedural requirements will be different if the land is privately owned rather than publicly owned. Correct. But the substantive requirements that apply to any future mining will not change significantly. The Clean Air Act will apply. The Clean Water Act will apply. I understand all of that. But we all know from, I mean, we see NEPA cases coming through here all the time. We all know that the NEPA EIS process, if done properly, is procedural but with enormous practical consequences because the person or the entity preparing the EIS is required to engage in substantive analysis and we're going to do this, we're going to do this, we're going to do this, and the following consequences follow, and we will do the following mitigation things, da-da-da-da-da-da, and very often that usually results in substantive changes to the plan as a result of the analysis that's done. I mean, that's just the way NEPA works. I guess the FLPMA authorizes BLM to undertake land exchanges, and Congress has not, Congress, NEPA applies to federal action and it doesn't apply to non-federal action. It doesn't apply, I mean, your complaint here is basically that if the land exchange goes forward, I'm sorry to characterize it a complaint, your question, your point. You don't call it a complaint. That's okay. Your point. But FLPMA does not say to BLM, retain public lands because we want NEPA to apply to everything. It says, BLM, if you think that the public interest will be served by acquiring some land and giving away others, that's your prerogative to make that decision. And as part of that, NEPA won't apply to the land that is disposed of. But NEPA requires, and NEPA applies right now, NEPA requires that enough analysis be done so that the decision makers can understand the actual on-the-ground consequences of the action that will be undertaken. That's correct. The EIS that we have here in front of us is extremely general in terms of its analysis of any consequence that the mining activity will have. The reason it is extremely general is that it's made an assumption that the mining will take place in precisely the same manner and precisely the same degree whether or not the exchange takes place. I think that is a highly questionable assumption because if the exchange does not take place, every MPO that ISARCO files will be subject to a requirement of a very specific EIS directed precisely at that MPO so we will know very precisely what the consequences will be. We have a very high likelihood that that plan will be modified in various ways as a result of the EIS process. By engaging in the land swap here, none of those detailed EISs will ever be done and none of the consequences of those EISs will ever be felt. That's my problem. Well, I guess, again, the NEPA procedures won't apply, but the substantive statutory requirements of the statutes are. I heard you say that and I understand that that's so. What I'm saying is you will get different consequences, overlapping, but different consequences from enforcement of the Clean Water Act and the Clean Air Act compared to getting a detailed EIS for every MPO that's filed. Well, so your analysis, Your Honor, is essentially that there will be different substantive results as a result of the application of the procedural statute. That's correct and that happens very often with respect to NEPA because the theory of NEPA is once we understand what the consequences are because having gone through the procedures of NEPA, the decision-makers will make certain substantive decisions based on what they've learned. And so we need to do an EIS here to determine whether the decision not to, whether the absence of an EIS later will have, to analyze the effects of not doing an EIS. Let me put it in a slightly different way. It's pretty clear, and the EPA says this in very strong language, that ISARCO knows pretty much what it wants to do, but ISARCO has basically not come forward with any detailed plan. I think it's entirely feasible for ISARCO to come forward now, based on the record I see here in front of me, with a fairly detailed plan of what it wants to do and for the BLM to do an EIS now based upon what it wants to do. Now, I don't say that it has to not engage in the swap because it would avoid later EISs. What I'm saying is I think it's entirely feasible to do what would amount to an equivalent of the later EISs, based upon what ISARCO says it intends to do with the land, because until it does that, you really are not going to have a radically different consequence, and you won't know about it until you've had that analysis. Well, I guess I have to respectfully disagree, Your Honor, and the decision before the court is not whether the court would prefer for BLM to do this analysis now, but whether it's an abuse of discretion for the agency to decide, based on the evidence that it has in the record. It's an abuse of discretion to assume that the manner of mining and the degree of mining will be exactly the same. Yeah, that's right. May I ask a question here, counsel? Can you explain the decision not to analyze, as part of the FEIS, an alternative in which the land exchange would not occur and mining would take place on only a portion of the selected lands? As I understand it, when it was prepared, you were supposed to consider alternatives here. Why was that alternative not considered? Well, there were two alternatives, in addition to the preferred alternative, analyzed, that include a smaller land exchange. But the alternatives here, and again, this comes back to my opening point, the agency decision is a decision whether or not to go forward with a land exchange. It's not a decision to authorize mining. So the agency looked at the preferred alternative, it looked at the buckeye alternative and the copper-butte alternative, which were smaller exchanges, and it looked at the no-action alternative, no exchange at all, and described the expected impacts of all of those. The limited mining alternative that CBD advocates, excuse me, was an alternative that was premised on the idea that only some of our SARCOS claims were valid, and therefore BLM would be able to prohibit mining on invalid claims. But the problem with that, as we explain in our brief, is that you don't get to the question of claim validity in the normal procedures that apply as a SARCOS seeks to develop its claims, seeks to exploit its claims, under the authority granted under the general mining law. All right. Thank you. I will yield to the intervener. Thank you. May it please the Court? My name is Norman James. I'm counsel for SARCO. In the limited time I've got, I want to briefly address the mining law and actually sort of respond to a question that Judge Nelson had asked. I also want to respond, Judge Fletcher, to your concerns about what happens if the exchange occurs and Flipman doesn't apply and NEPA doesn't apply. First, with respect to the rights under the mining law, as Judge Nelson, as you've indicated, there is a clear line of cases in this circuit, which we've discussed, the Shumway case, the Curtis Nevada case, the Richardson case, the Collard case. All those cases recognize that if you have an unpatented mining claim, you do have the right to use and occupy the surface of the land and develop minerals from that property. That's a very basic concept. The most recent case is Shumway, but Collard might be the case that's really more applicable here because Collard reaffirmed, citing an earlier Ninth Circuit decision, I think it's Whitmer v. Adams, that the United States cannot invalidate a claim, an unpatented claim, without complying with the Administrative Procedure Act. So a mining claim, even if it's unpatented, and even if there hasn't been an administrative determination of validity, i.e. that a discovery meeting the prudent operator test has been made, nevertheless, you clearly have rights to use and occupy your property. So let me move on then to the concerns, Judge Fletcher, that you've expressed here. First of all, let's take a step back. The purpose of a mining plan of operations is not to regulate mining. The purpose is to ensure that the mining operations are conducted in a way that don't cause undue or unnecessary degradation. And the land swap will avoid the necessity for ever filing an MPO with respect to any of the land that comes into private ownership. That is true, Your Honor. The purpose of avoiding environmental degradation served by the MPO will no longer be served because they're not required. Well, again, I don't want to retread what my colleague, Mr. Haig, has discussed, but again, mining is permitted under federal law. It's authorized under the Mining Law of 1872 and subsequent statutes. We know that, as I said before. The MPO process is intended to ensure that mining is conducted in a way that doesn't unnecessarily destroy the surface of public land. Once that land becomes private land, of course, it's no longer public land. And the concern of ensuring that unnecessary— You just went over that, and your time is wasting, so let me ask you a couple of questions. Good. Thank you. I referred to the EPA letter, which, for a bureaucrat, they've got pretty strong language. They strongly object to what's going forward here and strongly object to the EIS. First off, they say approximately one billion tons of material have been activated to circle Ray. Proposed action would enable the circle to process approximately three billion more tons. Are those numbers about right? That's actually low. So more than three billion? The Ray mine, Your Honor, produces 250,000 tons of ore per day. So those numbers actually aren't in the ballpark. The point about numbers is we're moving from one to three. What are your numbers? Do you want to ten or two to eight, or what are we talking about? Well, no. I need to back up a step. There's a misconception in their comments. The Ray mine, the Ray complex, which is the focus of the land exchange, it's still in operation today. It's been almost nine years since the land exchange was originally approved. ASARCO is still there. They're still operating. They're operating on unpatented mining claims, private land, and state land, the same mixture of different property interests that existed. You don't have much time, and you keep wandering. I asked you if you have better numbers. What are they? Well, all I can tell you, Your Honor, no. And this is why it's hard to explain. I have the same problem Mr. Haig does. Whether or not the exchange occurs, Your Honor, the tonnages that are going to be produced from that mine aren't going to change. I see what you're saying. That's the problem I have with that. The assumption that EPA makes, which is erroneous, is again that the exchange facilitates mining, and that's the point I'm trying to make here. The exchange doesn't facilitate mining. That's a different way. I know the EPA says we're extremely dismayed. We have strong objections. They're clearly unhappy. But let me ask you a different question, and that is if the BLM assumption is right, that mining will take place in precisely the same way and precisely the same degree whether or not the land exchange is approved, why in the world is a SARCO spending so much time and money in order to accomplish this land swap when in fact they can do exactly what they want to do in exactly the same manner without the land swap? I have two responses to that. First, and I'm glad you asked that question, and I'll answer your question and sit down unless obviously the panel has further questions. First of all, BLM in its NEPA documents and its decision documents, Your Honor, did not assume that mining was going to occur in precisely the same way. That's incorrect. I think you read a different report than I read. What they said was mining is the likely future use of the property, but any mining without the exchange would occur subject to meeting federal requirements if the exchange doesn't take place. But they did not say that mining would take place in exactly the same way. That is a statement that appears in the appellant's brief. It doesn't appear in the NEPA document. It sounds like the government agreed with that statement too, but okay. All right. The reason a SARCO is interested in this exchange is primarily for land tenure, land security, because while an unpatented mining claim, as I explained earlier, grants rights to the locator, it still is a form of property interest that can easily be invalidated. For example, if you don't make a maintenance file in your honor every year as required under another section of FLPA, your claim is presumed to be abandoned. So by doing the exchange, it gives a SARCO greater certainty. But, again, as explained in the EIS, Your Honor, most of the Let me cut to the chase. You're talking about sort of administrative requirements that I understand. Some of you bother someone. If you mess them up, you're going to suffer some consequences. But let me cut to the chase. Is it a matter of indifference to you that once the land exchange takes place and this is now private land, you no longer have to comply with either FLPA or NEPA in order to go forward with mining operations on the now land that is now in your own private hands? Does that not matter to you? Well, I think it matters in the sense that it is an additional layer of bureaucracy, and we've seen in this case, Your Honor, how long it takes to wind through the process. But we have MPOs. I mean, that's another thing that seems to be missing. We have mining plans of operation in place now for activities that are occurring on the unpatented mining claims. So SARCO works with the BLM. But, again, it's a bureaucratic process that can take, in this case, we're coming up on nine years. And so you may need to get approval of a plan of operations, and by the time you wind your way through this process, it can be five, six, seven years down the road if there are appeals. So it's not simply trying to avoid regulation because, as Mr. Haig indicated, we're still subject to a panoply of different environmental laws that apply either way. It simplifies the process, obviously, but more importantly is land tenure. And it is very important. Some of these parcels are actually in the Ray Mine pit being mined. We want to make sure we control those parcels. As to the rest of it, as explained in the record, it's environmental buffers, it's title, it's land security so we can plan for future operations. Thank you. Any other questions or comments before you sit down? I'm sorry. No, no. Thank you. Thank you very much. Thank you, Your Honor. Just a few quick rebuttals. With Judge Nelson, your question about the mining law and the claims and things like that, if you go to our reply brief for about pages 9 to 12, you'll see actually that the Interior Department agrees with us that the mere filing of a mining claim doesn't give you a right to develop a full-scale mine. And here's in the middle of page 9 of our reply brief a quote from the IBLA decision here that says, absent the discovery of a valuable mineral deposit on each of the unpatented load claims, ASARCO would not be entitled to the exclusive right of possession and enjoyment of the surface and subsurface rights and good against the United States. They would not have any rights against the United States to develop a mine. They have a right to explore when you file the claims. And if you look at the other cases we cite in rebuttal, for example, the Independence Mining Company case says that the United States or a company has some rights, quote, if a discovery of the valuable mineral deposit is made. And this is an APA case. There's no evidence of that in this case. In fact, the evidence shows that a good majority of those lands are, they low-balled the appraisal because there weren't any valuable mineral deposits. And what's your response to Mr. James' point that some of this land is already the subject of filed and approved MPOs, including parcels that are inside the Ray mine pit? There are a few parcels that are inside because what happens is some federal land gets patented, free title transfer years ago, essentially what they get here is a patent. So oftentimes at a big mine you'll have pockets of private land and federal land all mixed together. Clearly there wouldn't be any problem other than the bureaucratic delay, which he refers to in patenting those claims because they are easily proven, are they not? If they're in the middle of the mine itself, which is actively being mined, presumably they'll be able to. Right. Those very small portions probably, I would say, that sort of evidence may be in the record that they have a valuable mineral deposit. But the vast majority of the acreages are valued at $150 an acre, so they're not valuable mineral deposits. I guess the real question for me, to follow up on Judge Fletcher's line of questioning, is whether the APA requires the BLM to, in essence, comply with all of the NEPA requirements and require the preparation of full-blown EISs on land that they know is going to be mined in the future, and whether it's arbitrary and capricious for the agency to determine, in connection with approving a land exchange, that that's really necessary. That goes to the heart of the APA. How does BLM know that it will approve the mine? This mine has had serious environmental problems. The chances of it passing the undue degradation standard under FLTMA, which would be wiped out the moment the exchange is done, that's a heavy hurdle for federal mining projects to go forward and clear. We just don't know. Again, you've got to have your decision based on the sum of the land, because it's actively being worked as a mine. Degradation is permissible. The standard is whether it's undue or not necessary. Right. And the BLM hasn't made that determination. They don't know. In response to the question from Judge Fletcher, a SARCO attorney said that, well, it could be different. We're not really sure. If you look at our reply brief quoting the EIS at the bottom of our page 7, the EIS says, the foreseeable uses of the selected lands are expected to be similar under all alternatives. They essentially have said that this mine is going to go forward no matter what, and we just think under the APA you can't prejudge that. These are good, valid points, but you can't prejudge. BLM is under the strict rules of the APA. The Ninth Circuit, yes, there's some deference, but when you totally misapply the statute and you base your decision on evidence that's not in the record for the vast majority of these lands, and now if a SARCO wants to go back on those little in-holding pockets of federal land, they can propose a smaller exchange. They didn't do that here. They want the whole kit and caboodle to get rid of federal land. But it was arbitrary and capricious for the agency to decide that it wasn't necessary because of the fact that these are mining lands. Right. And I think you have to base that decision on the record, evidence that the claims are valid. In fact, the evidence goes the other way. And then also they assumed that the mine would be approved without ever going through the FLTMA analysis, and that's a big problem. And just one of the, I think a quote from a SARCO said, the exchange doesn't facilitate mining. If you actually look at our reply brief on page 24, a quote from the BLM says, BLM brief at 18, for example, the exchange provides lands which will enable a SARCO to plan expansions. BLM, our SARCO opposed the exchange, quote, this is a BLM brief, in order to expand its mining operations. That's what they're doing here. They want to get rid of FLTMA and NEPA. And last point, Judge Fletcher, on your question regarding NEPA, I 100 percent agree. Even though it's a procedural statute, it has definitely some substantive connotations. I'm a little slow in coming to the party on this one. Is there a copy of the complaint in the excerpts? Excuse me? Is there a copy of the complaint in the excerpts? You know, I do not know that answer. It was a file so long ago. As you were talking about APA and abuse of discretion, I'm looking to see, did you make, did you? Yes, I can, by memory, at the end of every claim of action, we always say it's arbitrary and capricious. No, no, my question is different. Did you make a separate claim that this action, this proposed action violates NEPA? Oh, yes. Because of the elimination of NEPA. The question is whether there's arbitrary increases under APA. You've got an independent cause of action that says this EIS does not satisfy NEPA. Right. FLTMA, NEPA, and APA already works into all that. Okay. Thank you very much. Your Honor, thank you, Judge Nelson. Thank both sides for very useful arguments. Center of Biological Diversity versus Department of Interior, ASARCO intervener now submitted for decision.
judges: Nelson, Fletcher, Tallman